**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 98-40573
Summary Calendar
_____

CARL E. BECK,

Plaintiff-Appellant,

versus

HARWOOD INDUSTRIES, INC.;
ALLEN WHEELER; SUE JACKSON

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Eastern District of Texas
(97-CV-688)
_____

April 7, 1999

Before JOLLY, SMITH, and WIENER, Circuit Judges.

PER CURIAM:[*]

Plaintiff-Appellant Carl E. Beck appeals the judgment of the district court, based on a jury verdict in favor of Defendants-Appellees Harwood Industries, Inc. ("Harwood"), Allen Wheeler, and Sue Jackson, rejecting Beck's allegations of racial discrimination in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et. seq. Beck contends that the district court erred in (1) overruling his Edmonson v. Leesville Concrete Co.[1] challenge to the jury selection and (2)

_____

[*]Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

[1]500 U.S. 614 (1991).

allowing irrelevant and prejudicial evidence to come before the jury. We conclude that Beck's objections are without merit and affirm the judgment of the district court.

I.

FACTS AND PROCEEDINGS

Harwood manufactures fiberglass parts for customized automobiles at a Tyler, Texas plant. Beck is a black male who was employed at Harwood for approximately one year, during which time he worked in the laminating department. Defendant Allen Wheeler was Beck's supervisor, and Defendant Sue Jackson served as Vice President of Harwood, overseeing day-to-day operations. Based on the incidents described below, Beck claims that he was (1) discriminated against in the terms and conditions of his employment, (2) denied a promotion, and (3) unreasonably suspended and fired, all on the basis of his race. The facts regarding each allegation are presented in turn.

A. Hostile Work Environment

Beck states that his employment succeeded without incident until he and three other black employees took Martin Luther King, Jr.'s birthday as a holiday from work. Beck insists that, after that occurrence, black employees were treated differently. He maintains that blacks were assigned a disproportionately high share of the menial labor assignments, such as taking out the trash, cutting the grass, and patching holes in the floor. Beck also contends that racial epithets were constantly uttered at work. On one occasion, a white employee told Beck that next year he too

**2**

would take "nigger day" off.  On another occasion, in front of Beck, white employees discussed membership in the Ku Klux Klan to get rid of the "niggers."

As of result of this treatment, Beck and another black employee spoke to Harwood's General Manager, Mr. McLouth, who documented Beck's complaints and reported the matter to Jackson. She, in turn, reviewed the memorandum prepared by McLouth and met with the parties involved.  Jackson testified that she instructed the parties "to stop any name calling . . . that harassing one another in whatever way, was not going to be tolerated."  Beck testified to the contrary, stating that Ms. Jackson told him not to worry, that "nigger" was just a meaningless word.

B.    Failure to Promote

Beck was dissatisfied with his position as a laminator, so he showed interest when he was approached about the possibility of a promotion into the molding department, albeit no black employees had previously worked in that department.  Beck claims that (1) he was required to take a test, even though white employees being considered for such positions had not been required to take it, and (2) the resin furnished for his test was inadequate to ensure peak performance.  Furthermore, maintains Beck, the outcome of the test and possible promotion were never communicated to him until the day he was fired.

Defendants respond that mold building requires a higher level of skill than laminating, and promotions to mold building were rare.  According to Harwood's production manager, even Beck's

laminating work was rated "poor to fair." The production manager further stated that the resin used in Beck's molding test was satisfactory; he was simply unable to perform that test satisfactorily.

C. Unreasonable Suspension and Termination

1. Suspension

In a heated argument with a white co-employee during regular work hours, claims Beck, he was threatened with scissors by the white employee who stated, "Nigger, I will run these scissors all the way through you." Testimony was presented, however, that Beck charged the white employee after questioning his intention to use the scissors to harm him. As a result of this altercation, which Jackson termed a "severe safety violation," both Beck and the white employee received three day suspensions. Beck claims that he was not at fault, and was suspended because of his race.

2. Termination

Subsequent to his suspension, Beck was terminated by his supervisor, Wheeler, for refusing to take out the trash. Beck counters that it was raining at the time, and he was simply waiting for the rain to subside before venturing outside. Beck insists that he was fired because of his race, asserting that no white employee had ever been fired for refusing to take out the trash while it was raining. The defendants presented contrary testimony regarding the weather conditions at the time Beck refused to take out the trash, as well as advancing that the real reason for his protests was his poor attitude and work ethic.

D.    Procedural History

After he was terminated, Beck filed suit against Harwood, Jackson, and Wheeler under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act, alleging that, because of his race, he suffered a hostile work environment, was denied a promotion, and was unreasonably suspended and terminated.    The district court dismissed Beck's Title VII claims against Jackson and Wheeler, but allowed the Title VII claim against Harwood and the § 1981 claims against all three defendants to proceed.

After a two day trial, the jury found that none of the defendants was liable to Beck for racial discrimination.    The district court rendered judgment in accordance with the jury's verdict, and Beck timely appealed.

II.

DISCUSSION

Beck challenges the district court's judgment on two fronts: (1) under Edmonson,[2] the district court erred in overruling Beck's objection and allowing defendants to strike one of only two potential black jurors, and (2) the district court abused its discretion in admitting irrelevant and prejudicial evidence of Beck's alcohol abuse and unsatisfactory job performance, and Harwood's increased employment of minorities following Beck's termination.

A.    The Edmonson Claim

In Batson v. Kentucky, the Supreme Court held that equal

---

[2]Id.

5

protection principles prohibit a prospective juror from being peremptorily challenged on the basis of race.[3] Five years later, the Court held that a party to a civil suit has standing to raise the prospective juror's equal protection claim when the opposing party uses a peremptory strike to exclude that juror on the basis of race.[4]

We conduct a three step inquiry to determine the propriety of a Batson/Edmonson challenge. First, the complaining party —— in this case, Beck —— must make a prima facie showing that the non-moving party exercised a peremptory challenge on the basis of race. Once this showing is made, the burden shifts to the non-movant to articulate a race-neutral explanation for the strike. Third, if the race-neutral explanation is not sufficiently probative, the burden shifts back to the complaining party to prove purposeful discrimination.[5] We will only reverse the district court's decision on a Batson/Edmonson challenge if its ruling was "clearly erroneous."[6]

During voir dire, defense counsel struck potential juror Corine Wilson, one of two black members of the venire. Wilson's only statement during questioning was "I'm Corine Wilson. I'm employed at Trane in production. My husband Louis Wilson is

---

[3]467 U.S. 79, 89 (1986).

[4]Edmonson, 500 U.S. at 629-30.

[5]Batson, 476 U.S. at 96-98; U.S. v. Huey, 76 F.3d 638, 640-41 (5th Cir. 1996).

[6]Great Plains Equip., Inc. v. Koch Gathering Sys., Inc., 45 F.3d 962, 964 (5th Cir. 1995).

retired from Trane."  Beck contends that as Wilson was one of only two potential black jurors in the venire and defense counsel did not ask any follow-up questions, the only reasonable explanation for her dismissal is race.

We cannot agree that Beck's bald, unsupported assertion establishes a prima facie case of racial bias.  In fact, we have stated that "[w]here the only evidence proffered . . . is that a black prospective juror was struck, a prima facie [Edmonson] claim does not arise."[7]  Beck is unable to point to any facts or circumstances that suggest defense counsel dismissed Wilson because she was black.[8]  In fact, the other potential black juror was ultimately seated on the jury.[9]  As Beck can offer no corroborating evidence to establish a prima facie case of racial discrimination in defendants' exercise of the peremptory strike of Wilson, Beck's Edmonson challenge fails.[10]

---

[7]United States v. Branch, 989 F.2d 752, 755 (5th Cir.), cert. denied, 509 U.S. 931 (1993); see also United States v. Lane, 866 F.2d 103, 105 (4th Cir. 1989) ("this does not mean that a prima facie case of discrimination arises every time a prosecutor strikes a black prospective juror"); United States v. Lewis, 837 F.2d 415, 417 (9th Cir.) (finding no Batson error when one of two black members of the venire was struck), cert. denied, 488 U.S. 923 (1988).

[8]See United States v. Moore, 895 F.2d 484, 485 (8th Cir. 1990) (stating that a prima facie case of racial discrimination requires a party to "come forward with facts, not just numbers alone").

[9]Cf. Ford v. State, 423 S.W.2d 245 (Ga. 1992) (noting that the prosecutor had a heavy burden of proof when he struck 9 out of 10 black venire members).

[10]We note that even if Beck was able to establish a prima facie case of racial bias, defense counsel has articulated several race-neutral reasons for striking Wilson.  First, she was

B.    Admission of Evidence

In reviewing evidentiary rulings made by the district court, we apply an abuse of discretion standard.[11]  If the inadmissible evidence actually contributed to the jury's verdict, harmful error has occurred and the case must be reversed.[12]  Credibility determinations, however, are left to the discretion of the jury.[13]

Beck first contends that the district court should have excluded evidence that he suffered from alcohol-induced gastritis and possible alcohol dependency because such evidence was irrelevant and prejudicial.  As neither party alleged that he was terminated as a result of alcohol use, argues Beck, his condition could only have been adduced to prejudice the jury.

Although we agree that admitting evidence adduced solely to arouse juror sentiment against a defendant would be an abuse of

---

a production worker, similar to Beck, and defense counsel expressed concern that she would identify and sympathize with Beck.  Additionally, when Beck's counsel mentioned the use of the word "nigger" in the workplace,  Wilson — as well as one white juror who was also dismissed — reacted with non-verbal disapproval. See e.g. United States v. Perkins, 105 F.3d 976, 979 (5th Cir. 1997); United States v. Atkins, 25 F.3d 1401, 1405 (8th Cir. 1994) (both considering a venire member's reaction to questioning during voir dire as a legitimate basis for a peremptory challenge).  Furthermore, defense counsel's reasons for exercising his peremptory strike were not challenged by Beck in the district court; thus, Beck is precluded from arguing pretext to us on appeal.  See Branch, 989 F.2d at 755 n.2 (facts not enunciated to district court in support of Batson objection are waived, barring reviewing court from considering them on appeal).

[11]United States v. Skipper, 74 F.3d 608, 612 (5th Cir. 1996).

[12]Id.

[13]United States v. Narviz-Guerra, 148 F.3d 530, 538 (5th Cir.), cert. denied, 119 S. Ct. 601 (1998).

discretion,[14] in this case we recognize relevant, probative reasons for the admission of Beck's medical information. Beck was seeking compensatory damages for his physical ailments, the cause of which he ascribes to the racial discrimination he suffered and to his ultimate termination. As correctly noted by the district court, Beck's symptoms —— depression, headaches, and high blood pressure —— could have been related to his alcohol consumption. As this information would be relevant and probative to the jury's assessment of Beck's damages were the defendants to be found liable, the court did not abuse its discretion in admitting evidence of Beck's alcohol-induced gastritis.

Second, Beck argues that the district court committed reversible error in admitting evidence from his personnel file. The obvious answer to this argument lies in the rhetorical question, how is a party to defend a failure to promote claim without considering the work performance of the employee seeking redress? Beck's contention that "[t]he evidence was irrelevant to any matter in dispute" is facially without merit. The job performance and workmanship of an employee is directly relevant to his qualification for promotion. The district court properly admitted personnel file evidence of Beck's work performance.

Third, Beck maintains that the district court improperly admitted evidence of Harwood's employment of minorities <u>after</u>

---

[14]<u>See</u> <u>Meller v. Heil Co.</u>, 745 F.2d 1297, 1303 (10th Cir.) (the introduction of drug paraphernalia in a vehicle would have improperly aroused jury sentiment against a driver in a products liability action regarding the vehicle), <u>cert. denied</u>, 467 U.S. 1206 (1984).

Beck's termination, as anything that happened subsequent to his firing is irrelevant to his discrimination claim. Supplying the jury with this information, claims Beck, served no purpose in the lawsuit and only confused the jury. Although we agree that subsequent employment practices generally are not relevant in determining whether the employer previously discriminated in the workplace,[15] they can complete an extended view of the racial makeup of the workforce before, during, and after the employment action at issue.

Beck initially submitted Harwood's 1996 employment figures, which indicated a low percentage of minority employees, to demonstrate Harwood's unfriendliness toward minorities at the time he was fired. To rebut this snap shot's inference of a racially-biased workplace, defendants introduced Harwood's employment figures for years bracketing Beck's 1996 termination to demonstrate that, without any change in employment practices, the racial composition of its workforce was only temporarily and coincidentally low at the time that Beck was fired in 1996. The decision to admit such evidence was well within the sound discretion of the district court and does not constitute reversible error.

III.

CONCLUSION

Beck's challenges to the jury selection and the district

---

[15]See Teamsters v. United States, 431 U.S. 324, 341-42 (1977).

**10**

court's evidentiary rulings are without merit.  Not only was he unable to establish a prima facie case of race discrimination in the defendants' exercise of a peremptory strike, but the defendants were able to articulate race-neutral reasons for that juror's dismissal.  The court's finding of no racial animus was not clearly erroneous.  Neither did the district court abuse its discretion when it admitted evidence of Beck's alcohol-induced gastritis, his prior work performance, and the minority makeup of Harwood's workforce after Beck's termination.  For the foregoing reasons, we affirm the judgment of the district court in all respects.

AFFIRMED.